Mr. Birdman, please start so that we can focus. With great pleasure, your honor. May it please the court, good morning. Jed Birdman of Cassowitz-Denson, Taurus-Freedman. Proclaimed appellate Dr. David John. Would you like to reserve some time, sir? We'll reserve three minutes for rebuttal. With the court's permission, thank you. And you saw how expensive we fell out three minutes ago. Well, I wouldn't presume on the court's time, but I'll stop here as long as your honor has questions. Okay. So here's my opening salvo. Did, it's John you said? John. Okay, so did Dr. John bring the court's infringement to BSC's attention? I don't know the answer to that. It's not on the record. Okay. Well, so here's why I'm asking the question. When I look at 7.3a, Jane? I thought you were going outside. When I look at 7.3a, which obviously we have to read before we get to C, I see language that says, Jane shall promptly inform Skynet in writing of any infringement of intellectual property rights by a third party of which he has knowledge and shall provide Skynet with any readily available information relating to such infringement. So I think one could read A to be a predicate to both B and C, so that A is written, we deal, that is we, Dr. John and BSC, as part of our deal is an exchange of money for ownership of the patents and other things. And in a particular instance, when Dr. John becomes aware of an infringement, if in that circumstance he brings it to the attention of BSC, then B and C come into effect. Am I totally wrong about that? Am I not seeing something that's there? It seems to me that that's the circumstance that's contemplated, and in the absence of that circumstance, why are we here? Now, a lot of smart people have looked at this, and so there's probably a simple answer, but it's not apparent to me. Well, I think there are a couple of answers to that question. All of us arrive at the position that the rest of 7.3 is not limited only to infringement that Dr. John brings to BSC's attention. And how would I know that? The first clue to that is if you look at, if you stop at 7.3a and you continue, we're, of course, on page 112 of the record, into 7.3b, which the first sentence reads, sign that shall have the right, but not the obligation, to institute, prosecute, and control legal proceedings to prevent or restrain such infringement. So Your Honor would say, I take it, such infringement, that seems to refer back to 7.3a. Yes. But when we continue after that, we abandon the subset of categories, the subset of infringement suits that Dr. John brings to Simon's attention, and we go into focus to refer to any infringement action at all. And so this is the second sentence of 7.3b on page 112. John agrees to assist Simon in any infringement suit, as Simon begins to do, to enforce intellectual property rights, or in any declaratory judgment action. I don't know if you remember the sentence, but it was taken where it said, such infringement, drop out. And so that's the first textual clue to the fact that the universal infringement actions to which the burnout right in 7.3c applies is not limited just to the subset of infringement that Dr. John brings to Simon's attention. But then what would the purpose of 7.3a be? There would be no reason for 7.3a, right? Because you wouldn't need that subset. Because the second sentence that you read to me creates an obligation on Dr. John to assist. So if 7.3a is essentially superfluous, then you could have gone right to the obligation to assist. And then once infringement is identified, the obligation to exist arises. And what comes to Dr. John as a result of that assistance is 7.3c. So I hear you. But then it seems to me that that interpretation would read out anything to 7.3a, which obviously we're not supposed to agree on, do we? It does not read out any interpretation. Because 7.3a imposes an affirmative obligation on Dr. John if he runs an infringement to bring that to Simon's attention. Dr. John is an inventor who was active in the field before he disagreed. He may come to hear something. What 7.3a does is rope him into an obligation to bring the infringement that he hears of, which BSC may not have heard of and might never hear of, and bring it to BSC, which can then act on it if it chooses. What the remainder of 7.3b speaks to, and what 7.3 speaks to, is not just limited to infringement claims that Dr. John learns of, which he has to bring to BSC, but any infringement claim at all regardless of who learns of it, which is also, frankly, Your Honor, consistent with the purpose of the agreement. And I think it's difficult to believe that, Your Honor, positive is one in which everything here follows from the fact that Dr. John discovered an infringement or the Boston Scientific discovered it. On the reading, Your Honor, Crawford, if Dr. John discovered it, then everything would flow under the roof of such infringement, i.e., infringement that Dr. John brought, otherwise not. But that reading is not consistent with the fact that it's only Boston Scientific that has the right to bring infringements to, and the fact that the first sentence of 7.3b gives Boston Scientific the ability to say, never mind, the fair reading of the contract, the reading that makes sense of the provision as a whole, including the fact that the term such infringement isn't used in the remainder of 7.3b and thereafter, is that the rest of this provision applies to, as the second sentence of 7.3b says, any infringement suit as Simon makes it to. So, we're here this morning asking this Court to reverse the dismissal on the prunings of three of the claims in Dr. John's original complaint, as well as the denial of the two men. We began speaking of the first claim for breach of Section 7.3c. And the issue there is that Boston Scientific was required to make an earnout payment to Dr. John based on, and again I'm quoting 7.3c, any recovery of damages in the context of, if you look at the end of that very same sentence, a suit or settlement, an infringement suit or settlement, and that's the... And then, the thrust of your argument is that damages is the equivalent of an injury, of any other injury sustained. Exactly right, especially when the term recovery of damages... Well, did it receive any equivalent in money? Well, it received a non-monetary consideration. Well, the question is whether an offset is non-monetary. Well, there are a number of different ways to parse the settlement, and this, frankly, is a question of fact that shouldn't have been construed against Dr. John on the prunings. There was an exchange of licenses, in which part of what BSC recovered in settlement for its $2 billion damages claim was a set of licenses to Cory's patents. That has non-monetary value. And there was also an offset in the payment, where BSC... ...on what it would have otherwise had to pay for its own infringement because of the infringement claim that it held against Cory. Now, really... Okay, Tom, I'll take it. How did the trier, I guess the district court, determine whether an offset qualifies as damages? I think that since the agreement we contend is ambiguous in that regard, like any other contract case, you have to have discovery into the intent of the parties. But we never got there because the content was dismissed on the 12C motion. We never got to discovery. We never got to understanding either the intent of the parties when the contract was negotiated and what they may have said or failed to foresee. But the contract, 7C and 7.3C, it seems clear to me. We're talking about damages, and these are words like compensated for expenses. Then it says ordinary damages to distinguish them from special and punitive. Then it talks about an amount of balance. This can only be money, can't it? Our view is no. It can be more than just an identifiable corpus of money. It can certainly be a monetary savings where the same amount of money is sitting in the bank. And as to some of the words that you referred to just now, Judge Barry, I think it's important to note that here in the middle of 7.3C, on the 245th line down, any recovery or damages based upon such infringement shall be deemed to be net sales. And then it goes on to discuss recovery amount. Okay, but what do you mean of such recovery amount? Yes, but the recovery amount is what the recovery of damages in the suit of settlement is deemed to be. The word deemed and the notion of deemed says that just because the recovery isn't a briefcase full of cash that you can point to doesn't mean that it falls completely out of sight. No, besides that, the next sentence shall pay John an additional earner from such recovery amount. Pay? Yes, the recovery amount is what is deemed based upon the value of the settlement. Aren't you concerned that what's going to happen in the life of this agreement is... that Simon or BSC will create opportunities that aren't monetized. And then if they're not monetized, right, Dr. John... I did it wrong. What is it? Chang. It's John. So Dr. John will miss out on opportunities that are provided for in 7.3C because we begin with your notion that recovery of damages is ambiguous. So under Massachusetts law, we start with that. Therefore, we can look at all this. And because essentially what BSC can do is create opportunities with third parties where there's never a payout, right? You actually seek out third parties where you think there's an infringement and you say, let's make a deal, right? And there's certainly value in any exchange, but the question is if it's not monetized, Dr. John can be excluded. And that's really what this is all about. 7.3, though. That's just very good. That's the theme that runs through all three camps. And so just to reiterate your point, that's an agitating principle that informs whether BSC's reading of 7.3C is the only reasonable interpretation. I would submit part of the reason it's not is because of that opportunity for mischief that you identified. It's also very much the theme of our second claim, which is the implied covenant and the alternative, which says, okay, if that's all 7.3C means, we allege that this settlement was deliberately structured in bad faith. I thought that was your count three. It is count three, but it's the second one. So it's count three in the complaint, Your Honor. You said count two just now. That's not correct. It was count three. It was count three in the complaint. And it also informs the claim for breach of Section 9.4, which the district court never considered on the merits, because it says if you can simply, BSC can simply grant a professional medical license to a third party and capture all of the value of the past that way without sharing it. You said there was a violation of 9.4 in your complaint. It's not in the complaint. And you said that's the next issue. And you said, well, we can move to amend the complaint if you want us to. And then you never did, which brings us to the second. We did a close judgment. A close judgment. The motion which under 13 other factors, Your Honor, and Your Honor wrote about it on the panel, says very clearly it's decided consistent with the rule 15 factors. The district court in this case never considered futility of the claim and never considered on the merits the first time around. May I find the prejudice? It shouldn't have. Why shouldn't it have? Remember, it wasn't in the complaint. You further it from intermittently with the lawyers. Whether or not it was appropriate to decline to consider the merits before judgment, I'm pointing out that the denial we do then was not based in any way on an analysis of futility as to that claim, which there was a finding of futility in the first. There was a finding of futility. The judge found undue delay. The judge found undue delay. We submit that it was an abuse of discretion to reach that conclusion where nothing happened during the number of months that the motions were pending. There was no discovery at all. In fact, BSC took the position it would either collect, review, or produce documents that literally nothing happened. Under the circumstances, as Adam versus Newman says, we're trying to get in a legal theater even if it wasn't in the complaint. You should have filed a proposed amendment complaint. That's the rule. That's the requirement. It's not to say, well, we can do it, we can file it, we won't like to. Our post-judgment motion has pre-judgment. I'm talking about pre-judgment. Well, I'll certainly concede that had we filed an amendment, a proposed amendment complaint pre-judgment, we'd be standing in a different position today. Candidly, we didn't think that we needed to under the circumstances where although it wasn't alleged explicitly in the complaint, it was fully briefed and issued squarely during the BSC's briefing twice before the district court, and the district court never considered it, dismissed any prejudice under Rule 41, and then turned around and said, I'll do delay. You know, Your Honor mentioned baseball season earlier. The rule under the federal rules, and under Rule 15 in particular, the rule was not one striking the rat. We think it was an abuse of discretion on these facts, not even to afford one opportunity to amend or ever consider a change. But if we really had the opportunity to, we should have filed a proposed amendment to the complaint. You never did that. You didn't do that. And what about finality of judgment? You almost read Birch's issue to say, well, that doesn't matter anymore. I do think that it's a factor in being put into what's considered prejudice or what's considered under delay under the Rule 15 analysis. But in contrast to the other cases that BSC discusses in its brief, there was no trial here. There was no summary judgment. There was no discovery. And so it's respectfully an abuse of discretion to kick in and say, finality, finality, finality, this early in the case without any opportunity to ever get in the merits of those claims. And I would just add, I assume everybody's not. No, that's right. Exactly. I'm not aware about that. This entire issue of pre-judgment, post-judgment, Rule 15, relates almost exclusively to the Section 9.4 claims. Well, I have a 7.3 claim issue. With respect to the implied covenant claim, how could Dr. John reasonably expect a 7.3 suit to apply to any kind of recovery when it uses explicitly monetary terms? Although there is a common animating theme, which is the potential for mischief in excluding Dr. John, the implied covenant claim assumes that the settlement here will not be covered by 7.3C. And even if, assuming that, if we don't concede that for purposes of this claim, even if Boston Scientific would not be moving its rights for legitimate reasons or in response to Curtis taking that position to move a non-monetary recovery, the allegation here is that Boston Scientific engineered the non-monetary structure in bad faith in order to get around Dr. John's rights. And that's what Massachusetts law says. Even where you have discretion, you cannot do. That's what the implied covenant protects you against. Has Dr. John alleged any deceit by BSC in this case? Most of the Massachusetts cases finding a breach of the implied covenant involve some amount of deceit. Sure. And those cases are, for the most part, decided after discovery on summary judgment or trial. But has he alleged any deceit? He's alleged that the settlement was structured in bad faith. And the court can take judicial notice of a number of facts, which we reference in our brief on appeal, from the BSC-Curtis case, which deceit Boston Scientific's bad faith and its deceit. Dr. John asked to be kept apprised of settlements and involved in settlements. When that was revoked, he made a motion to intervene in the district court before the court of settlement for the limited purpose of guarding against the risk of creating a structured settlement that might impair his rights. This is docket item 481, the Curtis action, which this court can take judicial notice. We have copies here if the court would like. But in that proceeding, Dr. John raised exactly that point. What is it that you have copies of? What we have copies of is two briefs from the Boston Scientific Curtis action, which this court can take judicial notice, that are on PACER. In Dr. John's brief, where he seeks to intervene in the settlement negotiations, he says, I'm concerned about the risk of a collusive settlement that will get around any bad rights I have. Boston Scientific comes back. I'm so sorry to interrupt. I beg your pardon. I'm confused. Is that in this record? Or are you saying that's available to us if we choose to? It's not in this record, but the court can take judicial notice of it because it's publicly filed in a related judicial proceeding. And that's why it's not in the appendix. But that's only in response to the question, right? Right. And so the Boston Scientific says in response to that, what it assures the district court is that it would adequately represent Dr. John's interest and that Dr. John and ESC have a common interest in the damages portion of the case. Saying that to the district judge And then use the word damages. Yes, this is a direct quote from docket item 482 in the court's action at page 20. Dr. John and ESC have a common interest in the damages portion of this case. So that's evidence right there of bad faith. And the other key point as to bad faith is that when we look at the settlement agreement itself, which is in the record, it's on page 8471. It explicitly mentions that if Dr. John brings a lawsuit post-settlement relating to the settlement that means Cortis, that ESC will identify Cortis and has the right to control the action. And we think that those facts, coupled with the form of the recovery, are sufficient at the putting stages to state a claim for bad faith and we should be blocked out. What's the effect of the settlements language in line 3 of settlement agreement 3C? You know, the settlement, how is it? A suit or settlement? A suit or settlement, yeah. When we read the sentence as a whole, it begins with any recovery or damages and it ends with suit or settlement. Our position is that, first of all, Massachusetts law says we understand the word damages but we don't normally think of damages as what you get in a settlement. So by using... Why? Why? I don't think so. You might get a payment in lieu of damages. You might get a payment reflecting your damages. But I think, and this is just me up here talking on this point, typically with a settlement recovery, damages you get from court in some way are awarded damages. But here, where the word damages is used in the context of suit or settlement, that's a strong textual clue that the word damages here is being used broadly in a way that goes beyond its narrow sense and that it's broad enough to encompass the settlement consideration. All right. Thank you. I don't know why the hell this is going on. Okay. Thank you. Is it Mr. Woolf? Yes, it is, Your Honor. Good morning. Good morning, sir. Matthew Woolf. He was soon knocked in. Deep laugh. I don't tend to be brave. Yeah, that's okay. This is Armandine Porter for the Boston Scientific Defendants. Your Honor, Judge Greenwood, you really got to the heart of the issue and I took it down as best I could. You asked about creating opportunities that aren't monetized. And that's exactly what we're talking about here. And Boston Scientific paid Dr. John $60 million precisely to gain the express right to create opportunities that weren't monetized. Dr. John got $60 million for nothing. What does he mean for nothing? He claimed about $60 million. Okay, what does that mean? When we benefit nothing or something, we're past that, right? But it's his patent. What? That was our patent. He paid $60 million to buy the patent. Which he invented or created or had. We do agree with the following proposition, okay? One of those law clerks is brilliant, has tons of patents, etc. And in a new and emerging technology. And the new and emerging technology, you believe, infringes the patents that you now have bought by Dr. John. Yeah. And you say, you know, do you want to go through 10 years of litigation or do you want to reach an accord? They say we'll reach an accord. And they give you $1 billion for their infringement, right? Now, in that situation, would you agree that Dr. John should be accorded a certain percentage, according to your agreement, of that payment from brilliant 1234 or whomever law clerk to BSC? Do you agree with that proposition? If they pay us $1 billion for practicing this? Yes. Absolutely. Yes. I mean, distributing the contract, it depends on what happened. If there was an award of damages, yes. If there was an award of damages, yes. If there were other circumstances, I don't know. That's okay. That's my hypothetical answer. It is as I've just said, right? You've identified them, you've come to this accord, and they're willing to give you $1 billion, right? Now, my question is, I think simple and direct. Would you have to turn around and give Dr. John a percentage of that payment? If it was just a licensed negotiation before a lawsuit was filed?  No, not under the contract. Okay. A lawsuit's filed. And the day after the lawsuit's filed, you sell. No, we would not have to do that. If there's an award of damages, and then the subsequent sale, we would have to pay them. And that's expressed in the lines of contract. That's okay. I just want to make sure I understand. So you contemplate, by the language of 7.3 CMU, overall agreement as well, that there is only one circumstance in which, in the hypothetical I've posed, you would have to turn around after receiving payment and pay Dr. John, and that would be only if there was a specific award of damages by a court. Correct. Of course, that hypothetical is not what we're confronted with here. I won't. That's why. Understood. Can I just go back to the $60 million for a second, if I may? Because in a typical license agreement, we say we're paying the next percent of our sales, and it's a win-win. If we practice your technology, we both make money. If we don't, we don't pay you anything. Here we paid him $60 million before we did anything. What did we buy for that $60 million? The right to use the patent. No, that we paid separately. We had a one royalty obligation if we actually used the patent. Those are the net sales provisions. We owe him 10% if we used it. The $60 million is above, beyond, and before we ever used the technology. In fact, we paid $10 million because we didn't use the technology. That was $50 million originally, and we never wrote another $10 million check because we didn't use the technology. So what did we buy with that $60 million? That's his 7.3B. Silence shall have the right, but not the obligation, to institute, prosecute, and control the law proceedings. So we can choose to file a lawsuit or not. You can control infringements. You can control litigation. We can prosecute or not. You can structure settlements, I suppose. Absolutely. That's what we paid the $60 million for. To structure settlements to evade a monetary award, that's not good. Is that good? It's not to evade a monetary award. We would want money if we could get money. And that's what Judge Robinson decided. I want to make something clear. Judge Robinson was the judge for the original suits between Horse and Boston Scientific. Judge Robinson was the judge that decided those briefs that counsel mentioned on the record that he wanted you to read. Judge Robinson was the one who decided this. I'm Robinson. She's Sue Robinson. Yes, you are. Judge Robinson was the one who decided his general opinions. So when there's discussions of bad faith or deceit, this was all in front of Judge Robinson, from day one of the lawsuits between J&J and BSC, to Dr. John saying I don't want to be a part of this proceeding, to us saying he doesn't need to be, to the decision that's before you today. All the cards were on the table. There was no deceit. It was all in front of Judge Robinson. She said there was no money to change hands. There was no money to change hands. But here's what is perplexing me, and maybe you can help me, okay? Sure. If I look at the transaction between BSC and Quartus, I see the following. There is an assessment made by BSC and Quartus of what the value of the purported infringement of the John patents are. There had to be a value ascribed to it, right? And there's a value that both you and Quartus, I obviously view differently until there's an agreement, of what your infringement of the Quartus patents that issue were. They said our patents were worth a couple million bucks, two or three million bucks. I don't know what everybody said, but everybody had a view, right? There were four different views, right? And then there was an agreement, and then there became two views. You know, this infringement is worth X, and this infringement is worth Y, and then you mess it up, right? There's no record evidence of that at all. There's nothing to suggest that that was ever done. There's no – the set-off is the same height as that. There was an X and a minus Y, and that's how it happened. Well, okay, then you are helping me. Help me with this specific question. Was there an agreement that there was an infringement of the John patents? There was a finding that there was an infringement that was upheld by the Federal Circuit. Okay, so... And James said it was worth $1.2 million. Okay, so there was an infringement, and it was worth whatever, right? It was worth whatever was never decided. That's the critical point here. So you're saying the finding by the Federal Circuit is different than what's contemplated in 7.3? There was no finding. There was a finding of liability, not as to damages. Damages was not yet – that was the trial, but it had not happened yet. No, I get that. So there's a finding of liability, but no findings at all as to who or what the allegations. Right. Hence the settlement. Subsequently. Correct, there was no subsequent settlement. Right. And in that subsequent settlement, was there not an understanding, agreement, any synonym that you'd like to use that you think is applicable about infringement of the John patent? Infringement, yes. The value, no. Well, of course. So once there's an infringement – here's the situation I'm trying to grapple with. Once there's an infringement, an understanding, agreement, finding, whatever, of infringement, doesn't that mean that Dr. Jung has a right to whatever that infringement monetized? Absolutely not. That's exactly what 7.3b says. Let's assume we never had trials. Let's assume Boston Scientific and Johnson & Johnson sat down and said, we're about to sue each other, but let's not sue each other. Let's not waste our time in court. Let's cross-license these patents. And let's agree that Boston Scientific is going to pay $1.75 billion as a kicker. Under the money language of this contract, we will be absolutely right to initiate or not initiate lawsuits. That's what we paid the $60 million for. Dr. Jung could have said, no, I want a more active role in what goes forward. Most licensors or sellers of patents don't get front money. They're not that magnetic. He could have said, look, I want to play in whatever you do. If you get a cross-license on a patent, I want a percentage of it. If you decide not to sue someone, I want a percentage of it. You know what Boston Scientific's response would have been? That we're not going to register $60 million. No way. We're paying a lot of money to you for a patent that may be of no value to us ever. Well, you obviously thought it was of some value because you wouldn't have run into this whole business. Well, we hoped it was of some value, absolutely. Well, why wasn't the offset qualified as a recovery of damages? There was not a case or a treatise or a law review article or a dictionary or a statute anywhere, and Dr. Jung never found one, that would suggest that that would come from the definition of damages. There was nothing, nowhere in the dictionary. Well, there was no finding in those terms. I mean, there was no evidence. How would you make that determination? It sort of seems to me a legal issue, and you'd have to have evidence. Somebody has to talk about what these terms mean. Your Honor, every case of Dr. Jung, even what he would put as his best cases for what damages are, and I want to be very clear, that first sentence of 7.3C that Dr. Jung calls cost so much, that's not the output of sentencing. That first sentence doesn't say we or Dr. Jung claim under any circumstance. It's the second sentence that we need to focus on. So this isn't even a contract where he says, I get 25% of whatever you make in a lawsuit. What this says is under certain circumstances, we're going to be in dollars more debt as net sales, i.e. the things you'd otherwise pay royalties on. It's that sentence, that's what obligates us to pay. Well, it talks about any such recovery. You're talking about money, it seems to me, in that case. Agreed, absolutely. Any recovery of ordinary damages. Of money. And then... Right, and then... The whole thing is about money. Agreed, absolutely. My client received not a penny. No penny came. And so that's what Dr. Jung obviously said. Absent any payment. Absent any money. There are a number of other issues in fighting this case that could have been decided upon. But for purposes of judgmental pleadings, we focus on one most obvious thing. We don't get a penny. If we don't get a penny, you don't get a penny. So can I ask you a question? Sure. So let's flip it. Yes. And Cordes is going to pay you 1.7 billion, right? And it's the same perspective on infringement of patents, right? So now instead of, as you represented to us, Cordes saying it's worth only 1 or 2 million, they say it's worth a lot more. And vice versa, you say that they agree that your infringement of their patent is worth 1 or 2 million, right? Sure. So 1.7 is coming your way now, right? It's a wonderful day in America. Absolutely. Now, in that circumstance, does Dr. Jung get part of that 1.75? I suspect in that circumstance he would argue that given the bifurcation of the case... Can I say I love you, man? I really do. It's amazing. I want to know what he'd say. I want to know what you'd say. In that circumstance, would you say that you now... Quiet, be a seat. We've got to pay Dr. Jung according to our obligations under the agreement. If the other boxes were checked, yes. There are other boxes that aren't issued yet. Okay. But let's assume those boxes are checked. You'd say yes, right? Yes. Okay. Because we got money. So that's the only circumstance. There has to be money. There's got to be money. There's got to be a judgment. There's got to be award damages. I think in this case, if you're hypothesizing about 1.75, I understand. Can I talk briefly about the 9.4 issue? Is that not of interest to you? We got the 7.36. Isn't there something grammatically wrong with it? Look at the last sentence of C. Any such recovery shall... Shouldn't it be be counted towards? I don't understand the be count. That's a title, isn't it? You mean it's supposed to be be counted? Yes. Oh, all right. Or count. It doesn't make sense that way. It should be be counted or count. There's an extra order to associate it with. Okay. Never mind. I just wondered. But you can get a 9. He wants to get a 9. If he wants it, he can get a 9.4. Whatever you say, you're presiding. You live better. I'm sorry. It's kind of too broad. Let's start talking. On the issue, Your Honor asked about finality. I would just note that, of course, not only here do we have a motion, we have a cross motion. Dr. John told Judge Robinson that this case was in a posture that he was at all going to please. And then to turn around and say, just kidding, we actually had additional theories we wanted to raise. And to the extent there's now a discussion of the 15-A standards, I'm always reluctant to tell two judges what I understand a previous opinion to mean. My understanding of what Burch says is that in a 59 context, I wrote it, Your Honor. Yeah. You got it. Yes. My understanding is that the 15-A standards, the factors to be considered are several factors to be considered, but the thumb that's on the scale in a prejudgment context is now off the scale. That's my understanding, and that's consistent with, and I would ask the court, and I think this case really resolves all the issues on 9.4, the CMR versus City of Philadelphia opinion, which was January of this year, talks about, and this is in the briefs, talks about underdelay being one of the grounds. And the best example of underdelay is, could they have done it before, and why didn't they do it? And that's the real issue here. They had 18 months to make this argument. They never made it. They never filed a proposed amendment complaint. Under Bush, under Suleiman, under Edwin Brooks, that this clearly, Judge Robinson did the right thing there. Was I reading 7.3a incorrectly? I don't want to spend any time on it. It's just crazy, and it's a red herring. I agree with counsel's reading. I believe that, as much as I'd like to agree with you, in an effort to preserve my credibility, I agree that 7.3b and 7.3c apply, no matter who brings it to the attention, but I think it's critical, again, that that first sentence says unambiguously that we have the right to institute, prosecute, and control legal proceedings. But we're not. We can rent a suit and drop it. That's value. That's a monetization possibility, and we have the right not to exploit Dr. Johnson to get money because he only got the 69. All right. Thank you. Just briefly, Your Honor, before turning to some of the specific points made by counsel for BSC, I want to note that the discussion is very far down the road and just underscores the importance of the discovery here and why this case should not have been dismissed unambiguously. Because there are issues of material fact that haven't been decided. There are a wide range of issues of fact, Judge Stoner, ranging from what the parties said and negotiated at the meeting of the contract, ranging to what happened in the negotiations between Boston Scientific and Cordes. Counsel for BSC said that there's, you know, the settlement agreement doesn't say anything about the breakdown as to the value of BSC's claim and the value of Cordes' claim. We don't know what those numbers were. That's an appropriate source for discovery, an issue of fact. We don't know about all that Judge Robinson has seen. And, of course, it is correct that Judge Robinson presided over the original infringement suits and the liability trial and would have presided over the damages trial. But what Judge Robinson might have seen and the questions she might have formed aren't part of the record. I don't know if Judge Robinson was in the room for all or part of the settlement negotiations. That's not in the record. Wouldn't she ordinarily not be part of the settlement negotiations? I would assume she would not, but we just don't know. I have to ask my colleagues, well, my colleagues who were both district judges, whether it's ordinary for a district judge to sit in to the settlement negotiations. It depends. Let's go ahead. So that's the first overarching point, that there are a wide range of issues of fact that are being discussed here as if they're part of the record when they're not. This case was dismissed on the pleading, and that's part of the error here. A lot was said about the $60 million up-front payment. Obviously, the Boston Scientific thought it was buying something extremely valuable because it agreed to pay that money up front. It also, of course, agreed to pay up to an additional $110 million if the provisions of the contract were satisfied, and that's what brings us here today. As to Boston Scientific's right to control, institute, prosecute, control, and bring for proceedings, Boston Scientific may have had the right to bring it to control. It may have had the right to abandon a valuable lawsuit because it saw fit for business purposes. What it did not have the right to do, what Dr. John did not bargain for, was to have Boston Scientific act in bad faith to create and structure and monetize a valuable opportunity to get around his express rights. But what are they supposed to do when the collective assessment of two assets is so disparate? I mean, if in their exchange with Portis, it requires a payment from Boston Scientific of $1.75 billion, I mean, by the agreement itself, it says, the value of this is much more than the value of the infringement on Dr. John's patents. So what are they supposed to do in that situation? Well, you know what the net payment was. We don't know, and you heard from my present counsel, what Portis said the John infringement claims were. What you didn't hear is what Boston Scientific's own expert said, which is that adjudicated infringement finding of liability was worth in excess of $2 billion. And this is an area where we need discovery and understand how and why the parties arrived at a settlement that works this way. As to whether the lawsuit falls within the meaning of any recovery of damages by suit or settlement, we heard repeatedly, not a penny came in, didn't get a penny. Without trying to be too cute, I would just point out that a penny saved is a penny earned. And money that BSC didn't have to shell out of its own corporate treasury to make up the difference on its payment is every bit as much in recovery of damages and settlement as if there had been a direct payment that they took home. I don't know. All right, thank you, sir. Thank you. Obviously, a case that was well argued and well briefed, and we appreciate it very much.